**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL ACTION NO. 25-264** |
| **VERSUS** | * | **SECTION: L** |
| **KENNETH OKEITH FRENCH, JR.**<br>**SHAJUAN TERMELL FRENCH** | * | |

**ORDER & REASONS**

Defendants Kenneth French and Shajuan French individually move to suppress evidence obtained during a traffic stop conducted by Louisiana State Police ("LSP") on September 9, 2025. R. Docs. 34, 36. The Frenches maintain the traffic stop and accompanying vehicle search violated their Fourth Amendment right against unreasonable searches and seizures, and move to suppress evidence acquired as a result. After considering the record, briefing, and applicable law, the Court rules as follows.

## I. BACKGROUND

In early 2025, an undercover agent with the Drug Enforcement Administration ("DEA") New Orleans division received a call from DEA agents in Boston, Massachusetts, informing him that 50 to 60 kilograms of cocaine had recently arrived in New Orleans for sale. R. Doc. 90 at 6. The Boston agents provided the undercover agent with the telephone number of the purported source of the cocaine supply. *Id.* at 7. The undercover agent began negotiating with this supplier, posing as a prospective buyer. *Id.* The undercover agent ultimately followed the supplier to a stash house, where the DEA seized 70 kilograms of cocaine. *Id.*

Following this, the supplier began working with the DEA as a confidential source. *Id.* The confidential source connected the undercover agent to multiple drug brokers located in Columbia, El Salvador, and Mexico. *Id.* The undercover agent posed as an associate of the confidential source

and asked the brokers to help identify customers for the cocaine supply located in New Orleans. *Id.*

Over the next several months, the brokers arranged five drug deals for the cocaine supply with various customers. *See id.* at 24–37; Ex. M. The confidential source communicated with the brokers about these drug deals over the encrypted application “Zangi.” R. Doc. 90 at 28–29; *see also* Ex. M. In a series of messages, the confidential source and brokers discussed meeting with unidentified third parties. Ex. M. The confidential source screenshotted these Zangi messages and sent them to the undercover agent. R. Doc. 90 at 28. In one message, a broker informed the confidential source about a girl who had arrived in New Orleans, and wanted to “set up a deal,” “do a test,” and “buy from [the confidential source.]” *Id.* In another message, a broker sent the confidential source a video of a large quantity of cash as evidence that a prospective customer was serious about conducting a drug deal. *Id.* at 30, 33; Ex. M. All five of the planned drug deals fell through for unknown reasons. R. Doc. 90 at 32–34.

On the morning of September 9, 2025, a broker contacted the undercover agent to inform him that a group of customers had arrived in the New Orleans area to purchase five kilograms of cocaine for $12,000 per kilogram *Id.* at 8; Ex. F at 1–2.[1] The broker provided the address of a seafood restaurant where the customers were waiting, *id.*; R. Doc. 36-4 at 1, and supplied a phone number he said belonged to the customers. Ex. F at 2; R. Doc. 90 at 10. The undercover agent called the number and an unidentified male answered. R. Doc. 90 at 10. The unidentified male confirmed that the customers were at the seafood restaurant and were eager to meet up, test the product, and leave. *Id.*; Ex. F at 2. The undercover agent asked how much the customers wanted, and the unidentified male responded, “five.” Ex. F at 2.

---

[1] The undercover agent spoke to multiple brokers on September 9 to coordinate the deal. *See* Ex. F.

At approximately 12:50 p.m., agents with the DEA New Orleans division established surveillance at the seafood restaurant. R. Doc. 45-2 at 2. The DEA was unable to identify any potential customers at that time. *Id.* At 1:32 p.m., the undercover agent called a broker and asked to change the meeting location to a Wendy's restaurant on North Causeway Boulevard in Metairie, Louisiana. *Id.*; Doc. 90 at 11. During this call, the broker informed the undercover agent that the customers were driving a black truck and were from Alabama. R. Doc. 90 at 11; Ex. F at 5. Shortly thereafter, the DEA set up surveillance at the specified Wendy's restaurant. R. Doc. 45-2 at 2. Approximately forty minutes after the meeting was relocated, the DEA observed a black Chevy Silverado truck with an Alabama license plate carrying the Frenches pull into the Wendy's parking lot. *Id.* A few minutes later, the undercover agent received a call from a broker informing him that the customers had arrived at the Wendy's. *Id.*; R. Doc. 90 at 11.

For approximately one hour, the undercover agent, alongside other DEA agents, observed the Frenches wait in the Wendy's parking lot. R. Doc. 45-2 at 2. The Frenches occasionally stepped out of the vehicle to take a phone call, smoke a cigarette, or briefly walk into the Wendy's. *Id.* During this time, the undercover agent contacted Louisiana State Police Master Sergeant David LaCroix to ask for assistance with the investigation. R. Doc. 90 at 13. The undercover agent informed Sergeant LaCroix that the DEA was investigating two individuals who had traveled to New Orleans to purchase five kilograms of cocaine. *Id.* at 14. The undercover agent identified the Frenches' vehicle as a black Chevrolet truck and provided the license plate number. *Id.* at 14–15. Sergeant LaCroix contacted LSP Sergeant Nicholas Folse and informed him there was a black truck with an Alabama license plate suspected of having either narcotics or money to purchase narcotics in it. *Id.* at 62, 78. Sergeant Folse and Sergeant LaCroix, accompanied by LSP Trooper

Nicholas Dowdle, then traveled to the Wendy's restaurant and set up surveillance alongside the DEA. *Id.* at 62, 126.

At approximately 3:07 p.m., the undercover agent contacted a broker and asked to relocate the meeting to a Home Depot in Slidell, Louisiana. R. Doc. 45-2 at 2. At 3:12 p.m., DEA agents observed the Frenches pull out of the Wendy's parking lot and turn eastbound on I-10, heading in the Slidell direction. *Id.* The DEA and LSP tailed the truck. R. Doc. 90 at 79. Trooper Folse's radar system recorded the truck traveling over the speed limit, *id.*, and Trooper Folse observed air fresheners hanging from the truck's rearview mirror obstructing the driver's view. R. Doc. 45-3 at 3. Trooper Folse contacted LSP Trooper Camden Stahl, who had joined the convoy. R. Doc. 90 at 80. Trooper Folse relayed to Trooper Stahl that the Frenches' vehicle was speeding. *Id.*

At 3:37 p.m., Trooper Stahl pulled the Frenches over on I-10 eastbound approximately twenty miles from Slidell. *Id.* at 49. Sergeant Folse waited momentarily before pulling over and joining Trooper Stahl. *Id.* at 80. Shajuan French stepped out of the driver's seat of the vehicle and handed his license to Trooper Stahl, while Trooper Stahl explained the nature of the traffic violations. R. Doc. 36-4 at 7. In a post-incident report, Trooper Stahl stated that he observed Shajuan's hands visibly shake while they spoke, R. Doc. 45-3 at 3, and during the evidentiary hearing, Trooper Folse testified that he also observed Shajuan's "very obvious" shaking and noted that this behavior was atypical of most motorists. R. Doc. 90 at 81. After briefly speaking with Shajuan, Trooper Stahl walked to the passenger-side window where Kenneth was seated. *Id.* at 101. Kenneth handed Trooper Stahl the vehicle's registration and insurance information. *Id.*; R. Doc. 36-4 at 7.

Trooper Stahl and Trooper Folse then proceeded to question Shajuan and Kenneth separately about their whereabouts that day. R. Doc. 90 at 86–88. When initially asked by troopers

where he was coming from, Shajuan said "New Orleans." *Id.* at 88. Shajuan then revised his answer and stated they had traveled from Alabama to New Orleans that day to eat and shop at the Riverwalk Outlet Mall. R. Doc. 36-4 at 9. Shajuan told troopers that they had not purchased anything at the mall. *Id.* Kenneth likewise stated that he was coming from "New Orleans." R. Doc. 90 at 86. Trooper Folse testified that he found this answer unusual considering they were currently located in New Orleans. *Id*. Neither Kenneth nor Shajuan mentioned their roughly hour-long stop at the Wendy's restaurant at this time. *Id.* at 87–88; R. Doc. 36-4 at 13.[2]

The troopers ran a National Crime Information Center warrant check on Shajuan, which came back clean at 3:44 p.m. Ex. D at 6:45. At 3:47 p.m., Trooper Stahl asked Shajuan for consent to search the vehicle, which Shajuan denied. R. Doc. 36-4 at 13. Trooper Stahl responded by calling a drug detection canine unit to the scene. *Id.* at 9.

At 3:54 p.m., Certified Canine Handler Trooper Dowdle arrived with his drug detection dog, "Beli." Without being prompted, Shajuan emptied his pockets and dropped his pants to the ground. *Id.*; R. Doc. 90 at 92. A few moments later, Trooper Dowdle began leading Beli around the Frenches' vehicle. Ex. D. at 18:04. The pair made two laps. *Id.* at 18:04–30. During the second lap, while approaching the passenger-side door, Trooper Dowdle twice placed his hand against the vehicle. *Id.* at 18:24–29; R. Doc. 90 at 129. On both occasions, Beli responded by lifting himself up and placing both front paws on the passenger side of the vehicle and then dropping back down. *Id.* at 18:24–29; R. Doc. 90 at 129. Beli then ceased all movement and pointed with his body and head, indicating the presence of a trained odor. R. Doc. 90 at 164; Ex. G. After Beli's indication, the troopers searched the vehicle and discovered $68,500 in cash in the glove box. R. Doc. 36-4 at 16.

---

[2] Shajuan French did not disclose the stop at the Wendy's until after the vehicle was searched and the $68,500 was discovered. R. Doc. 36-4 at 13.

## II. PRESENT MOTIONS

The Frenches move to suppress evidence obtained during the September 9, 2025, traffic stop and its derivatives. The Frenches maintain that law enforcement violated their Fourth Amendment rights by detaining them without reasonable suspicion and searching their vehicle without probable cause.

The Frenches do not challenge the legality of the initial traffic stop for speeding and obstructed view. The Frenches instead argue that the LSP unconstitutionally prolonged the traffic stop without reasonable suspicion of an independent offense. R. Doc. 36 at 7–8. In the Frenches' view, all traffic-related tasks were complete at 3:44 p.m., when Shajuan's warrant check came back clean. *Id.* at 7. From 3:44 p.m. onward, troopers required reasonable suspicion of additional criminal activity, which the Frenches contend they did not have. *Id.* at 7–8; R. Doc. 34 at 7.

The Frenches advance several arguments in support of this position. First, the Frenches challenge the reliability of the information supplied to the DEA. Kenneth emphasizes the apparent lack of knowledge about the brokers' identities or whether they provided accurate information in the past, R. Doc. 58 at 4; Shajuan maintains the information supplied by the brokers was too vague to reliably identify the Frenches. R. Doc. 34 at 12. Shajuan also emphasizes that hours of DEA surveillance—first at the seafood restaurant, then at the Wendy's—revealed no suspicious behavior on the Frenches' part. *Id.* at 11.

The Frenches next maintain that the circumstances of the traffic stop leading up to 3:44 p.m. did not create reasonable suspicion. Kenneth French contends that the only suspicious behavior reported by the troopers was Shajuan's alleged nervousness, which the Fifth Circuit has consistently found to be less than enough to establish reasonable suspicion. R. Doc. 45-3 at 3. Shajuan emphasizes that there were no visible signs of Shajuan's nervousness on the troopers'

body camera footage: no "shaking hands, profuse sweating, or a throbbing neck." *Id.* at 8. Shajuan further argues that the Frenches' answers to troopers' questions were neither evasive nor defensive, and maintains that when he failed to directly answer troopers' questions, he was simply exercising his right to remain silent. *Id.* at 6–7. Lastly, the Frenches contend that their whereabouts that day were not inherently suspicious, noting that New Orleans is a tourist hub and there is nothing unusual about visiting the city to shop at an outlet mall. R. Docs. 58 at 7; 62 at 8.

Next, the Frenches argue that the drug detection dog Beli's vehicle sniff constituted an unreasonable search. R. Doc. 61 at 1. The Frenches maintain that both requirements of the trespass approach to Fourth Amendment searches—as articulated in *United States v. Jones*, 565 U.S. 400 (2012), *Florida v. Jardines*, 569 U.S. 1 (2013), and *United States v. Richmond*, 915 F.3d 352 (5th Cir. 2019)—are satisfied: Beli contacted the vehicle and such contact was performed at the instruction of Trooper Dowdle, for the purpose of obtaining investigative information. *Id.* at 3; 89-1 at 9.

Finally, the Frenches argue that the LSP did not have probable cause at the time Beli contacted the vehicle to render the search permissible under the automobile exception. Kenneth challenges the reliability of the brokers' information, noting the five failed attempts to arrange a drug deal and the lack of detail in the brokers' description of the customers. R. Doc. 89-1 at 3–4. Kenneth also emphasizes that the brokers first informed the undercover agent that the customers were waiting at a seafood restaurant, but the DEA canvassed the area and could not locate any potential customers. *Id.* at 4. Shajuan reminds the Court that neither the DEA nor the LSP saw the Frenches engage in any criminal activity, nor observed any items, such as large quantities of cash, associated with drug transactions. R. Doc. 95 at 2. Shajuan further notes that the brokers were

unknown to law enforcement and maintains that the brokers' credibility and reliability was unestablished. *Id.* at 3.

The Government opposes both motions. In the Government's view, the undercover agent held reasonable suspicion of the Frenches' involvement in drug trafficking from the outset of the traffic stop, and this reasonable suspicion vested to LSP troopers through the "collective knowledge doctrine." R. Doc. 45 at 8. The LSP could therefore continue to detain the Frenches as long as reasonably necessary to confirm or dispel suspicions of drug trafficking. The Government maintains that reasonable suspicion continued to develop during the traffic stop due to Shajuan's nervousness, the Frenches' failure to mention they had traveled from the Wendy's restaurant, and the implausibility of their story about traveling from out of state to visit an outlet mall while not purchasing any items. *Id.* at 3–5, 9. The Government further challenges the Frenches' contention that the drug dog Beli's contact with the vehicle amounted to a Fourth Amendment search. Citing *United States v. Keller*, 123 F.4th 264 (5th Cir. 2024), the Government asserts that the Fifth Circuit has already "made clear that a dog placing its paws on a vehicle does not constitute a search." R. Doc. 85 at 6. Finally, the Government contends that, assuming Beli's contact amounted to a search, troopers held the requisite probable cause at that time. *Id.* at 1–3. To this end, the Government advances largely the same arguments it made with respect to the reasonable suspicion issue.

The Court held an evidentiary hearing on these motions, during which time the undercover agent, Sergeant LaCroix, Sergeant Folse, Trooper Dowdle, and LSP Certified Canine Trainer Sergeant Nicholas Schittone testified in person.

## III. LEGAL STANDARD

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. A defendant may move for suppression of evidence obtained as a result of a

search or seizure in violation of the Fourth Amendment. *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). The defendant bears the threshold burden of showing a search or seizure occurred. *See Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978). "Warrantless searches and seizures are *per se* unreasonable subject to certain narrow exceptions." *Alvarez*, 40 F.4th at 345. Thus, once the defendant establishes the occurrence of a warrantless search or seizure, the burden shifts to the government to show that the search or seizure was reasonable under one of the well-delineated exceptions to the warrant requirement. *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010); *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014).

## IV. ANALYSIS

### 1. The Traffic Stop was not an Unreasonable Seizure.

#### a. The Law Governing Traffic Stops

A traffic stop constitutes a seizure within the meaning of the Fourth Amendment and is thus subject to the constitutional imperative that it be reasonable. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). A traffic stop is reasonable when it is supported by "objective[] reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur." *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005); *Whren v. United States*, 517 U.S. 806, 809–10 (1996). To satisfy this standard, an "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion into the privacy of the detained individual. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion is determined by the totality of the circumstances. *Alvarez*, 40 F.4th at 345. "This is an objective test based on the facts known to the officer at the time of the stop, not on the motivations of the officer in making the stop." *United States v. Escalante*, 239 F.3d 678, 681 (5th Cir. 2001).

The general rule is that detention incidental to a traffic stop "may last no longer than required to effect the purpose of the stop." *United States v. Jansen*, 462 F.3d 399, 404 (5th Cir. 2006). For a routine traffic stop, "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id.*

**b. The Collective Knowledge Doctrine**

"Reasonable suspicion to stop a vehicle, or probable cause to conduct a search, may arise through the collective knowledge of the officers involved in the operation." *United States v. McPherson*, 630 F. App'x 330, 331 (5th Cir. 2016). "Under the collective knowledge doctrine, an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information" and there is "some degree of communication" between officers. *United States v. Zuniga*, 860 F.3d 276, 283 (5th Cir. 2017). Only minimal investigative details need to be shared between the officer with reasonable suspicion or probable cause and the officer initiating the detention, arrest, or search. *See U.S. v. Ibarra-Sanchez*, 199 F.3d 753, 757, 759 (5th Cir. 1999) (concluding that officers could rely on a radio bulletin that "a DEA agent had requested assistance in stopping [a] beige van because it was possibly transporting drugs or weapons" to effectuate a stop, provided the DEA agent themselves held reasonable suspicion); *United States v. McPherson*, 630 F. App'x 330, 331–32 (5th Cir. 2016) (finding the communication requirement satisfied when an officer shared his belief he held

probable cause, described the suspect's vehicle and its occupants, and asked for assistance in conducting a traffic stop).

**c. Informant Tips**

Information supplied by an informant may contribute to reasonable suspicion when it possesses sufficient indicia of reliability. *Adams v. Williams*, 407 U.S. 143, 147 (1972). Courts determine how much weight to afford informant's tips by reference to three factors: veracity, reliability, and basis of knowledge. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "Basis of knowledge" refers to how the informant obtained the information, while "veracity" and "reliability" concern the truthfulness and history of the informant. *Id.* at 227, 243–44; *United States v. Martinez*, 486 F.3d 855, 861–62 (5th Cir. 2007). "[V]eracity, reliability and basis of knowledge" are not "independent requirements to be rigidly exacted in every case." *Illinois v. Gates*, 462 U.S. 213, 230 (1983) (internal quotation marks omitted). "Rather . . . they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question of whether there is [reasonable suspicion or] probable cause . . . ." *Id.* Information supplied by an anonymous source whose veracity, reliability, and basis of knowledge are unknown may still support a finding of reasonable suspicion if sufficiently corroborated through independent police work. *Alabama v. White*, 496 U.S. 325, 329 (1990). Likewise, courts view an informant's tip with greater weight when the informant is able to accurately predict a suspect's future behavior, as such foresight suggests the informant possesses insider knowledge. *Id.* at 326.

**d. The LSP held Reasonable Suspicion of Drug Trafficking Activities at the Inception of the Traffic Stop**

The Frenches argue that the LSP unconstitutionally prolonged the traffic stop without reasonable suspicion of an independent offense. In the Frenches' view, the mission of the traffic stop was complete at 3:44 p.m., and the LSP continued to detain the Frenches without "specific

and articulable facts" pointing toward the Frenches' involvement in drug trafficking activities. The Government, in turn, takes the position that reasonable suspicion existed at the inception of the traffic stop based on the DEA's investigation and agents' observations at the Wendy's restaurant. R. Doc. 45 at 8.

After reviewing the record evidence, the Court agrees with the Government that troopers held reasonable suspicion of the Frenches' engagement in drug trafficking at the outset of the traffic stop. Several considerations guide this finding. First, the investigation preceding September 9 revealed what appeared to be a genuine conspiracy to traffic drugs. At the evidentiary hearing, the undercover agent—an individual with fourteen years of experience working hundreds of drug trafficking cases—testified at length about the investigation. R. Doc. 90 at 6. The agent explained that he was introduced to the brokers by a confidential source formerly involved in illicit drug trafficking. *Id.* at 7. The confidential source's background lends credence to the idea that the individuals the source connected the undercover agent to were genuine drug brokers.

In an ongoing text message exchange on an encrypted application, the confidential source and brokers planned various meetings between the source and unidentified third parties. Ex. M. The correspondents spoke in vague language and discussed the third parties "test[ing]" a product. *Id.* In one message, a broker wrote "Friends . . . I'll send you a video with the money so you can see that we're going to buy some of your materials to make sure everything is ok." *Id.* Another message included a video picturing a large quantity of money as described. *Id.* During the evidentiary hearing, the undercover agent testified that he interpreted these messages as reflecting the brokers' desire to conduct a drug deal, R. Doc. 90 at 31, a conclusion the Court finds credible.

Communications consistent with drug trafficking continued on September 9. The brokers informed the undercover agent that the customers were interested in purchasing five kilograms of

product at $12,000 per kilogram. *Id.* at 8. The undercover agent then communicated with an unidentified male, who confirmed that the customers were at the seafood restaurant and were eager to meet up, test the product, and leave. *Id.* at 10; Ex. F at 2. The undercover agent asked how much the customers needed, and the unidentified male responded "five." Ex. F at 2.

Second, the information provided by the brokers was sufficiently detailed and corroborated to reliably identify the Frenches as the prospective customers. Coordinating the deal in real time, the broker informed the undercover agent that the customers would arrive at the specified Wendy's restaurant in a black truck. R. Doc. 90 at 11. Forty minutes later, the Frenches arrived at the Wendy's in a black truck. R. Doc. 45-2 at 2. The broker further advised that the customers were from Alabama, R. Doc. 90 at 11, and the agents observed an Alabama license plate on the Frenches' vehicle. R. Doc. 45-2 at 2. The agents reported no other vehicle fitting the brokers' description at the Wendy's location. The Frenches waited in the restaurant parking lot for roughly an hour—an activity that while innocent on its face, in the context of the investigation, drew further suspicion that the Frenches were the prospective customers. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) (facts that appear innocent when viewed in isolation can constitute reasonable suspicion when viewed collectively). The brokers' information was "exceedingly fresh" and accurately forecasted the Frenches' movements. *See United States v. Powell*, 732 F.3d 361, 370 (5th Cir. 2013) (tips that are "exceedingly fresh" and accurately predict future behavior carry greater weight). The Frenches appeared in the Wendy's parking lot around the time the brokers represented the customers would be there and left the Wendy's and turned toward Slidell five minutes after the meeting was relocated to Slidell. R. Doc. 34-6 at 2. These observations, when coupled with the background investigation, provided more than enough "specific and articulable facts" to supply reasonable suspicion to the undercover agent.

The facts highlighted by the Frenches do not undermine this conclusion. While the brokers' identities were unknown and their reliability untested, there was no evidence showing they had been untruthful in their communications and their information on September 9 proved accurate: customers driving a black truck from Alabama waited at a specified location to presumably conduct a drug deal. The brokers tried and failed on five prior occasions to arrange a drug deal. *See* R. Doc. 90 at 24–37; Ex. M. But the undercover agent testified that, in his experience, it was very common for drug deals to fall through. R. Doc. 90 at 53. And while the Frenches emphasize the fact that agents did not identify any prospective customers at the seafood restaurant despite the unidentified male insisting they were there, R. Doc. 89 at 4, the undercover agent had not yet been provided with the customers' description. *See* R. Doc. 90 at 11; Ex. F at 5.

The undercover agent reasonably suspected the Frenches were the prospective drug customers. He informed Sergeant LaCroix that the DEA was investigating the Frenches on this basis and provided the license plate number of their vehicle. R. Doc. 90 at 14. Sergeant LaCroix passed this information along to the troopers initiating the traffic stop, for the purpose of detaining the Frenches. *Id.* at 62, 78. Under the collective knowledge doctrine, those troopers could rely on the undercover agent's reasonable suspicion to detain the Frenches, rendering the seizure reasonable.

**2. The Canine Sniff was not an Unreasonable Search.**

**a. The Trespass Approach to Fourth Amendment Searches**

There are two avenues for establishing a search occurred within the meaning of the Fourth Amendment: the reasonable-expectation-of-privacy test and the trespass approach. *Jones*, 565 U.S. at 405–08; *Carpenter v. United States*, 585 U.S. 296, 304 (2018). The Frenches invoke the later to

argue that the drug detection dog's sniff of the Frenches' vehicle constituted a Fourth Amendment search.

*United States v. Jones* is the leading authority on the modern trespass approach. There, law enforcement attached a GPS tracking device to the undercarriage of a vehicle and monitored the vehicle's movements for a period of four weeks. *Jones*, 565 U.S. at 403. The Court concluded the government's conduct constituted a Fourth Amendment search. *Id.* at 413. The Court's decision rested on two findings: first, the government had "physically occupied private property" by affixing a GPS tracking device to the vehicle, and second, the government had attached the device "for the purpose of obtaining information." *Id.* at 404.

Subsequent courts clarified the contours of *Jones's* two-pronged approach. In *Florida v. Jardines*, the Court concluded that law enforcement searched the defendant's property by allowing a drug detection dog to sniff the curtilage of the defendant's home. 569 U.S. at 4. Applying *Jones*, the Court characterized the case as "straightforward": officers brought the dog onto the defendant's private property for the purpose of gathering investigative information. *Id.* The particular mechanism used to intrude on the defendant's property and gather information—the drug detection dog—was of no legal consequence. *Id.* at 11. In *United States v. Richmond*, the Fifth Circuit explained that even momentary contact with private property can satisfy *Jones's* "physical occupancy" requirement. 915 F.3d at 358. *Richmond* began when a law enforcement officer observed the tires on the defendant's vehicle shake and wobble as the defendant drove down a highway. *Id.* at 354. The officer initiated a traffic stop, walked around the vehicle, and observed that the bolts on the passenger-side rear tire appeared stripped. *Id.* The officer then pushed his fingers against the tire to confirm his suspicion that it contained more than air. *Id*. The tires were later searched and found to contain methamphetamine. *Id.* at 355. Applying *Jones*, the Circuit

concluded that the officer's tapping of the vehicle's tires amounted to a search. *Id.* at 356. In reaching that decision, the Circuit recognized that the contact at issue was far briefer than in *Jones*, where a GPS device was affixed to a vehicle for several weeks. *Id.* at 358. But the Circuit found this distinction insignificant, reasoning that *Jones* grounded its holding not in the length of time the device was attached, but the attachment itself. *Id.* In the Circuit's view, even the simple tapping of a tire could constitute a Fourth Amendment search if performed for the purpose of obtaining information. *Id.* at 358–59; *see also United States v. Duncan*, No. CR 22-76, 2023 WL 2403444, at *5 (E.D. La. Mar. 8, 2023) (Under *Jones*, an officer searched a vehicle when he leaned on the windshield to get a better view of what was inside).

Three principles emerge from these cases. First, a Fourth Amendment search occurs when the government makes physical contact with private property for the purpose of obtaining investigative information. Second, a government actor need not physically occupy or contact the property themselves. The physical occupancy requirement can instead be satisfied with a tool, device, or in *Jardines's* case, a police dog. Finally, even momentary or fleeting contact can constitute a Fourth Amendment search, provided such contact is performed for the purpose of obtaining investigative information.

**b. The Drug Dog's Sniff of the Frenches' Vehicle was a Fourth Amendment Search.**

The Court finds that both prongs of *Jones's* trespass approach are met, and the drug dog's sniff of the Frenches' vehicle amounted to a search under the Fourth Amendment. During the evidentiary hearing, Canine Handler Trooper Dowdle testified at length about his training and handling of Beli. Trooper Dowdle's role as Beli's handler is to direct and guide Beli during drug sniffs. Trooper Dowdle trained to handle Beli during a multi-week certification course. R. Doc. 90 at 116, 133. During this course, LSP Canine Trainer Sergeant Nicholas Schittone taught Trooper

Dowdle various techniques for guiding Beli's movements. One of these techniques was known as "casting"—where a handler uses hand movements to direct the dog's attention. *Id.* at 123–25, 130, 141.

In the field, a typical vehicle sniff for Trooper Dowdle and Beli consists of two laps around the car. R. Doc. 90 at 130. During the first lap, Trooper Dowdle testified that he pays attention to which areas of the vehicle Beli sniffs. *Id.* To ensure a successful search, on the second lap, Trooper Dowdle will "cast" Beli's attention to areas he missed by physically tapping on the vehicle with his hand. *Id.* at 141. Beli's trained response is to sniff the area tapped.

On September 9, Trooper Dowdle and Beli performed their two laps around the Frenches' vehicle as standard practice. *Id.* at 128–29; Ex. D at 18:04–30. Trooper Dowdle testified that during the first lap, he noticed Beli focus primarily on the bottom half of the vehicle. R. Doc. 90 at 128. Trooper Dowdle wanted Beli to check the upper half of the vehicle, so during the second lap, Trooper Dowdle tapped the upper portion of the vehicle near the passenger-side window. *Id.* at 129; *see also* Ex. D at 18:24–29; Ex. G. The vehicle was tall, so to reach the upper portion, Beli lifted himself up on his back legs and braced himself against the vehicle with his two front paws. R. Doc. 90 at 128–29, 160; Ex. D at 18:24–29. Beli then sniffed the area where Trooper Dowdle tapped. Ex. D at 18:24–29. After Beli dropped down on all fours, Trooper Dowdle again tapped on the side of the vehicle, and Beli responded by lifting himself up and placing both front paws on the car. *Id.*

These facts establish a Fourth Amendment search on two grounds. R. Doc. 90 at 164. First, Trooper Dowdle's tapping of the vehicle amounted to a search because it was performed for the purpose of obtaining investigative information. Trooper Dowdle testified that it was important that Beli "check[ed] everything" during his sniffs, *id.* at 124, 157, 163, and that during the second lap

around the Frenches' vehicle, he "purposefully instruct[ed] Beli to check up higher" by tapping. *Id.* at 129, 163–64. Second, Beli's contact with the vehicle amounted to a search. Given the height of the vehicle, *id.* at 160, the only conceivable way Beli could sniff the upper portion was by bracing himself against the car. This, in the Court's view, is sufficient to conclude that Trooper Dowdle intended Beli to contact the vehicle for the purpose of obtaining investigative information.

In reaching this conclusion, the Court is aware of the case *United States v. Keller*, in which the Fifth Circuit affirmed a lower court's finding that no Fourth Amendment search occurred when a detection dog placed its paws on a vehicle during a drug sniff. 123 F.4th at 268. The key to *Keller's* holding was that the canine's contact was inadvertent—not part of an intentional effort on law enforcement's part to obtain investigative information. *Id.; see also United States v. Shen*, 749 F. App'x 256, 262 (5th Cir. 2018) (per curium) (affirming a district court's finding that no Fourth Amendment search occurred when there was *no evidence* the canine handler *directed* the dog to enter the vehicle); *United States v. Guidry*, 817 F.3d 997, 1006 (7th Cir. 2016) (finding no search occurred because "there [was] no indication that the officers intended to facilitate the dog's entry into the car"). The lack of intentionality is what dictated the outcome in *Keller* and what separates *Keller* from the situation at hand.

**c. Law Enforcement Held Probable Cause for a Vehicle Search at the Outset of the Traffic Stop.**

Under the automobile exception, officers may conduct a warrantless vehicle search if they have probable cause to believe the vehicle contains contraband or evidence of a crime. *Mack v. City of Abilene*, 461 F.3d 547, 552 (5th Cir. 2006). "Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed." *United States v. Carrillo–Morales*, 27 F.3d 1054, 1062 (5th Cir. 1994). In determining whether probable cause

exists, a "police officer may draw inferences based on his own experience . . . including inferences that might well elude an untrained person." *United States v. Banuelos-Romero*, 597 F.3d 763, 768 (5th Cir. 2010). Currency derived from or used to facilitate criminal activity can be considered contraband justifying a vehicle search under the automobile exception. *See United States v. Potts*, 459 F. App'x 455, 456 (5th Cir. 2012) (per curium) (officer could search a vehicle under the automobile exception where he had probable cause to believe that it contained currency stolen in a bank robbery).

In the present case, there was probable cause to believe that the Frenches' vehicle contained contraband connected to the planned drug sale at the outset of the traffic stop. The Court reaches this finding for the same reasons it articulated in support of its finding on reasonable suspicion: the multi-month investigation into the cocaine trafficking organization, the communications between the brokers and confidential sources evidencing an intent to arrange a drug transaction, and the brokers description of the customers and the corroborating investigation. The undercover agent testified that he believed there was probable cause for a vehicle search by the time the Frenches pulled out of the Wendy's restaurant and turned onto I-10. R. Doc. 90 at 18. The Court agrees with that assessment: the facts known to the agent at that time were such that an "officer of reasonable caution" would believe the Frenches intended on purchasing cocaine and that their vehicle would contain a large quantity of currency to facilitate that transaction.

From that point onward, probable cause continued to develop based on the LSP's observations during the traffic stop before the drug dog arrived on scene.[3] Three LSP troopers

---

[3] Before the drug dog sniff, Trooper Stahl told Shajuan that he did not have probable cause to search the vehicle. R. Doc. 36-4 at 9. Trooper Stahl's assessment does not dictate a finding of no probable cause, just as the undercover agent's view does not establish probable cause. *United States v. Cooper*, 949 F.2d 737, 744–45 (5th Cir. 1991) ("[Probable cause] cannot be established simply by showing that the police subjectively believed that probable cause existed; likewise, the subjective belief of the police that they did not have probable cause does not preclude the government's showing that there was.").

observed Shajuan "visibly shaking",[4] which Trooper Folse testified exceeded typical nerves. *Id.* at 81. The Frenches answers' to troopers' questions were unusual: Trooper Folse testified that both Frenches responded to a question about where they were coming from by stating their current location. *Id.* at 86–88. The troopers knew the Frenches had most recently traveled from the Wendy's and regarded their omission of this information as suspicious. *Id.* at 87–88. The Frenches claimed to have traveled from out of state to shop at an outlet mall but reported no purchases. And Shajuan French, moments before the dog sniff began, dropped his pants unprompted on the side of a busy interstate. *Id.* at 92. Trooper Folse testified that he had never seen anything like it. *Id.* These events contributed to the reasonable conclusion that the Frenches were engaged in unlawful activity, and that their vehicle contained evidence of the crime.

In conclusion, the record suggests that probable cause existed well before the drug dog's sniff of the Frenches' vehicle. Although law enforcement engaged in a Fourth Amendment search, they did so with probable cause, rendering the search reasonable under the automobile exception.

## V. CONCLUSION

For the foregoing reasons;

**IT IS ORDERED** that the Defendants' Motions to Suppress, R. Docs. 34, 36, are hereby **DENIED.**

New Orleans, Louisiana, this 24th day of September, 2026.

Eldon E. Fallon

THE HONORABLE ELDON E. FALLON

---

[4] R. Doc. 90 at 81. Along with Trooper Folse's testimony, *id.*, and Trooper Stahl's report, R. Doc. 45-3 at 3, which both noted Shajuan's nerves, body camera footage shows LSP Trooper Odom making a hand gesture indicating Shajuan was shaking.